07 CV 8023 (KMK)

DIRECT GROUP NORTH AMERICA, INC.
et al

v.

MAL DUNN ASSOCIATES, INC
et al

Exhibits B through E to the Summons + Complaint attached to the Notice of Removal

**EXHIBIT B**

Yvonne Ike

From: Yuen, Selene - Direct Group North America [Selene.Yuen@dgna.com]
Sent: Wednesday, July 11, 2007 10:29 PM
To: Rosen, Noah - Direct Group North America
Cc: Curry, Michael - Direct Group North America; Junker, Carol - Direct Group North America
Subject: FW: Mal Dunn

Here is the correspondence for when BMGCH was made aware that one of the lists we use was not paid by MDA....

Selene Yuen
Senior Director, Marketing Acquisitions
 BMG Columbia House
Direct Group North America, Inc.
One Penn Plaza | 250 West 34th Street, 5th Floor | New York, NY 10119
Phone 212-930-6637 (Mon, Wed, Fri) | 516-490-4669 (Tue, Thu)
Fax 212-930-4407

---

From: Yuen, Selene - BMG Columbia House, Inc. - New York
Sent: Friday, May 18, 2007 5:26 PM
To: 'christine_slusarek@timeinc.com'
Subject: RE: Mal Dunn

Thank you for bringing this to my attention. I am personally addressing this and you should receive payment within the next 2 weeks.
Have a great weekend.

Selene Yuen
Senior Director, Marketing Acquisitions
 BMG Columbia House
One Penn Plaza
250 West 34th Street, 5th Floor
New York, NY 10119
212-930-6637
www.bmgmusic.com / www.columbiahouse.com

---

From: christine_slusarek@timeinc.com [mailto:christine_slusarek@timeinc.com]
Sent: Friday, May 18, 2007 3:12 PM
To: Yuen, Selene - BMG Columbia House, Inc. - New York
Subject: FW: Mal Dunn

Hi Selene - I wanted to make you aware of this situation as it may impact your orders on my names. I am happy to process orders for BMG but if you are using MDA as the Broker, for now, I am requiring pre-payment. The past due $ have been an issue for a while and getting MDA to honor guarantees has been problematic.

I am happy to have you work with my group directly to place the orders, you can use another Broker or you can arrange for prepayment to access Time Inc. or American Express Pub names via MDA.

8/7/2007

The attached is what is currently outstanding from MDA to me based on BMG orders. I do not know if you have paid MDA for these orders or not but I suspect you have.

Please call if you have questions or need more info., I am hoping we can find a resolution here.

Thanks
Christine


Christine Slusarek
Executive Director, List Management
Time Consumer Marketing, Inc.
212 522 7708

-----Original Message-----
**From:** Chris Goodwin [mailto:cgoodwin@millard.com]
**Sent:** Thursday, May 17, 2007 2:23 PM
**To:** Slusarek, Christine - Time Consumer Marketing <christine_slusarek@timeinc.com>
**Cc:** Byron Taylor; Robin Lyons
**Subject:** Mal Dunn

Christine,

We wanted to make you aware of an ongoing issue with Mal Dunn's financial stress and staffing as it is being seen across all Info sister companies.

To date they owe Time Inc./Amex Publishing $85,147 and are past due on many orders, attached is a breakdown by Lists and Mailers. The key mailers are Bookspan, US Money Reserve and BMG Spanish offer. Millard Group is working to collect all past dues and is not fulfilling orders unless Mal Dunn sends in an actual check for prepayment.

If you have any questions concerning this please contact Robin, Byron or myself.

Thanks,

Christopher M. Goodwin
Account Manager - Time Inc.
Millard Group Inc.
(603) 924-9262 ext. 2125
Fax: (603) 924-9420
mailto:cgoodwin@millard.com
www.millard.com

The information contained in this electronic mail transmission, including any accompanying attachments, is intended solely for its authorized recipient(s), and may be confidential and/or legally privileged. If you are not an intended recipient, or responsible for delivering some or all of this transmission to an intended recipient, you have received this transmission in error and are hereby notified that you are strictly prohibited from reading, copying, printing, distributing or disclosing any of the information contained in it. In that event, please delete the original and all copies of this transmission

8/7/2007

Yvonne Ike

# EXHIBIT C

**From:** Yuen, Selene - Direct Group North America [Selene.Yuen@dgna.com]
**Sent:** Wednesday, July 11, 2007 10:30 PM
**To:** Rosen, Noah - Direct Group North America
**Cc:** Curry, Michael - Direct Group North America; Junker, Carol - Direct Group North America
**Subject:** FW: invoices
**Attachments:** image001.jpg

Here is the correspondence with MDA regarding the outstanding payment....

Selene Yuen
Senior Director, Marketing Acquisitions
BMG Columbia House
Direct Group North America, Inc.
One Penn Plaza | 250 West 34th Street, 5th Floor | New York, NY 10119
Phone 212-930-6637 (Mon, Wed, Fri) | 516-490-4669 (Tue, Thu)
Fax 212-930-4407

---

**From:** Russell Dunn [mailto:russd@maldunn.com]
**Sent:** Tuesday, May 22, 2007 3:54 PM
**To:** Yuen, Selene - BMG Columbia House, Inc. - New York
**Cc:** De Lorenzo, Krista - BMG Columbia House, Inc. - New York; Junker, Carol, YES Solutions
**Subject:** RE: Invoices

Hi Selene - Please accept my sincere apologies for this annoyance at such a crazy time. I've been assured that all the Time Inc. past dues have been paid. I plan on calling Christine at Time Inc. tomorrow to try to smooth things over with her. Please know that I am doing everything possible to insure that we don't have these types of issues in the future. Feel free to call me with any questions.

Best Regards - Russ

914-584-1189

-----Original Message-----
From: Yuen, Selene - BMG Columbia House, Inc. - New York [mailto:Selene.Yuen@bmgch.com]
Sent: Fri 5/18/2007 4:57 PM
To: Russell Dunn
Cc: De Lorenzo, Krista - BMG Columbia House, Inc. - New York; Junker, Carol, YES Solutions
Subject: invoices

Russell,

I received an email from Time Inc indicating that they will not release any orders unless it is prepaid because there is over $17M bill outstanding for orders you placed on our behalf for RyP using People en Espanol. 43% of the bill is over 4 months old. Please issue payment within the next 2 weeks and let me know when it is paid. Otherwise, we will be forced to submit future orders through someone else.

8/7/2007

I appreciate your prompt response.

Selene Yuen

Senior Director, Marketing Acquisitions

One Penn Plaza

250 West 34th Street, 5th Floor

New York, NY 10119

212-930-6637

www.bmgmusic.com <http://www.bmgmusic.com> / www.columbiahouse.com <http://www.columbiahouse.com>

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

# EXHIBIT D

## LIST MANAGEMENT AGREEMENT

This agreement is made by and between BMG Direct having an office at 1540 Broadway, New York, NY 10036 (List Owner) and American List Counsel, Inc. having an office at 88 Orchard Road CN5219, Princeton, NJ 08543 (List Manager) with regard to rental of lists and alternative media programs (Agreement).

1. Beginning July 1, 1999 for a term of two years List Owner appoints List Manager to manage its list and alternative media business including the BMG lists, ride-along programs and package insert programs outlined in section I of Exhibit "A" for a list management fee of 7% of gross rental dollars billed (excluding tape fees and shipping charges) for which payment is received. Once net rental dollars billed (i.e., gross rentals less list management fees, brokerage commissions, advertising agency commissions, and adjustments) exceed the agreed upon annual budget goal italicized in section II of Exhibit "A" (i.e., net billings of $14,758,974) the list management fee will become 8.5% of gross rental dollars billed net of adjustments which yield the first $1 million net rental dollars billed and received in excess of the respective annual budget goal, and thereafter 10% of gross rental dollars billed net of adjustments which yield net rental dollars billed in excess of the total of the budget goal plus the incremental net $1 million described above.

2. In the event the annual budget goal set forth in the italicized section II of Exhibit "A" is not met (i.e., net billings of $14,758,974) the list management fee will become 6.5%. List Manager will rebate to List Owner within ninety business days of year end, i.e., June 30, an amount equal to .5% of the year's total gross rental dollars billed (excluding tape fees and shipping charges) for which payment is received. Further, in the event the annual budget goal is not met by a shortfall of $1 million or more, the list management fee will become 6% rather than 6.5%, and List Manager will rebate List Owner in accordance with the above provisions.

3. It is acknowledged and agreed that to the extent budget goals are not met due to material changes by the List Owner within the list and alternative media rental program which have adversely effected the ability of the List Manager to obtain the budget goal as set forth in the italicized section II of Exhibit "A" and to the extent the resulting budget shortfall is not offset by other business opportunities provided by List Owner then, at the sole discretion of the List Owner, List Manager's budget goal may be adjusted by amounts that correlate directly with any such loss in ability. Further, if the List Owner provides additional business opportunities through material changes to the list and alternative media rental program which result in increased opportunity to obtain and/or exceed the budget goal then, at the sole discretion of the List Owner, List Manager's budget goal may be adjusted up by amounts that correlate directly with any such gain in opportunity. In the event of an adjustment in the budget goal the base for incentive payments as stated in Paragraph 1 and for rebates as stated in Paragraph 2 shall be adjusted accordingly.


Recycled Paper


09/24/99

4. It is acknowledged that any list or alternative media business arising in connection with any company acquired by List Owner, or any new business startups by List Owner except those set forth in section I of Exhibit "A", are not part of this Agreement and will be subject to separate negotiations if List Owner and List Manager wish to incorporate such list and alternative media business herein. Further, it is acknowledged that List Owner has the right to move the Latin list and alternative media business at anytime. List Manager's budget goal will be adjusted down based on the number of months remaining in the year and the remaining forecast billings as set forth in Exhibit "B", except to the extent billings may already exceed the Latin forecast in which event List Manager's budget goal will not be adjusted.

5. List Manager will assume responsibility for the cost of the PC Direct count system supplied to their location by Direct Tech on a bi-monthly basis.

6. For exchanges and direct rentals arranged on behalf of the List Owner, List Manager will receive a processing fee of $4.00/M not to exceed $400 per order.

7. A standard list brokerage commission of 20% or advertising agency commission of 15%, as appropriate, will be allowed to recognized brokers and agencies on the gross rental dollars billed (excluding selection charges, tape fees, and shipping charges) for which payment is received. On rentals direct to their customers List Manager will retain a 20% brokerage commission.

8. List Owner will have absolute control over all pricing and policies governing the use of the BMG Database.

9. List Owner will control all list rentals and exchanges and retains the absolute right to disapprove any proposed rental or exchange for any reason List Owner deems appropriate. List Manager agrees to furnish sample mailing pieces for all proposed rentals and exchanges for List Owner's approval in advance. Reference Paragraph 16 below regarding clearances.

10. List Owner can accept orders directly from brokers or mailers, and at its option List Owner will notify List Manager for processing and accounting purposes. In such event List Owner will pay List Manager for services provided under payment terms of Paragraph 6 above.

11. List Manager will bill and collect all monies due and will forward net dollars due to the List Owner on the bi-monthly payment date immediately following receipt of such payments from list users or their agents. It is understood that List Manager shall render payments to List Owner on the 15th and 30th/31st of each month. List Manager shall make best efforts to collect all monies due in a timely manner and will submit a written recap of outstanding accounts over ninety (90) days with comments and status as set forth in Exhibit "C".




12. List Manager will provide List Owner with annual marketing plan by March 15 of the contract year for List Owner's review and approval as set forth in Paragraph 16 regarding planning. List Manager agrees to spend no less than 15% of its annual list management fees (not including processing fees as described in Paragraph 6 above) on marketing and promotion to include the full funding of the BMG cocktail party held at the Fall DMA Conference under the term of this Agreement. The aforementioned marketing and promotion elements which make up the plan will be subject to review and approval by List Owner. List Owner will endeavor to work with List Manager to complete review and approval within sixty days.

13. List Owner has set forth in the italicized section III of Exhibit "A" marketing goals for FY99/00. Satisfactory performance against the plan shall be considered a material term of this Agreement. A work plan, deliverables and milestones will be established mutually by List Owner and List Manager and subject to approval by List Owner.

14. List Manager will maintain the mutually agreed upon account management team as set forth in Exhibit "F", BMG Transition Plan, including a dedicated team and support group. The dedicated account team FTE's will be filled and operational within the time outlined in Exhibit "F". Any changes in the BMG Transition Plan (e.g., timeline, meeting schedule) will require the prior written approval of the List Owner. There will be no changes in composition of the dedicated team or support group without List Owner's prior written approval. There will be no reduction in total FTE's comprising the dedicated account management team without List Owner's prior written approval.

15. List Manager will render financial and performance reports in accordance with Exhibit "C". In addition, List Manager will render performance reports against targets in formats and on schedules as required by List Owner. Preliminary annual financial business plans are due at List Owner by February 1st in accordance with Exhibit "D".

16. Operating standards for on-going communications, clearances, advertising, sales meeting schedules, and planning are set forth in Exhibit "D".

17. List Manager will conduct quarterly performance presentations containing detailed reviews of all activities under this based on format and content requirements to be established by List Owner. Preparation and presentation of the quarterly reviews will be undertaken directly by Donn Rappaport, Bob Tomlinson and Lori Magill-Cook together with the dedicated team. Performance presentations will be submitted in final form to List Owner no less than six (6) business days prior to presentation date.

- 3 -




18. It is understood and agreed that during the term of this Agreement List Manager will restrict its business relationships with competitors of List Owner in the manner set forth below. Specifically, List Manager will not provide management services of any nature whatsoever to Columbia House or any other marketer of music including brokerage, direct sales, or Internet services. Any current accounts as described above other than the Razor & Tie mailing list and alternative media program managed at the ALC New York office, will be resigned by List Manager immediately upon execution hereof with termination effective no later than ninety (90) days thereafter. However, it is understood that List Manager will be permitted to rent other properties it manages, including lists and alternative media, to Columbia House or other marketers of music.

19. This Agreement shall be governed by terms of the Confidentiality Agreement attached hereto as Exhibit "E" the provisions of which will survive the term of this Agreement.

20. List Owner shall have the absolute right at its discretion to terminate this Agreement upon ninety (90) days written notice to List Manager. In addition, List Owner shall have the absolute right to terminate this Agreement effective upon thirty (30) days written notice subject to List Manager's right to a twenty (20) day cure period with respect to any performance shortfall under this Agreement or any breach hereunder with respect to which it is notified in writing by List Owner (e.g., consistent monthly shortfalls in sales goals or significant shortfalls in the aggregate, collection/receivable problems, delayed remittance by List Manager, advertising and promotion inconsistent with that approved by List Owner, failure to render financial and performance reports in an accurate or timely manner, failure to adhere to operating standards, unapproved change in dedicated staff members or reduction in the number of FTE's dedicated to BMG account, etc.). ALC shall have the right to terminate the Agreement at anytime during the contract period upon six (6) months advance written notice. In the event termination is not effectuated on or before June 30, 2000 by natural expiration or termination by either party, then this Agreement shall automatically extend on a month-to-month basis subject to termination by either party on the same conditions as set forth above in this Paragraph.

21. Upon natural expiration of this Agreement, or termination as described above, List Manager will make its best effort to ensure a smooth transition and that List Owner's business and operations with respect to activities hereunder is uninterrupted. This shall include providing List Owner with all historical account information, data, records, and reports.

22. List Owner will have the right to audit List Manager's books and records pertaining to all transactions and activities in connection with this Agreement once during the term of the Agreement and once within two (2) years following termination. Such audits will be conducted during normal business hours where such books and records are normally maintained, and will be subject to fifteen day advance written notice request by List Owner.




23. To the extent state and local sales taxes must be collected on transactions hereunder, List Owner will instruct List Manager, and List Manager will bill clients as instructed and remit payments to List Owner so that appropriate payments can be remitted to state and local tax authorities.

24. Each party will promptly advise the other by certified mail of any actions at law, regulatory proceedings, or any other actions, proceedings, or inquiries brought by any state or federal authority. List Manager will indemnify and hold List Owner harmless with respect to any settlement, claim, or action brought by any third party against List Owner based on List Manager's performance or failure thereof under this Agreement. List Owner will indemnify and hold List Manager harmless with respect to any settlement, claim, or action brought by any third party against List Manager based on List Owner's performance or failure thereof under this Agreement.

25. This Agreement is personal to the parties and may not be transferred or assigned without the consent of the other party, except that List Owner may assign this Agreement, in whole or in part, to its parent, to any subsidiary corporations of such party, to any affiliated company, or to any company by which it is acquired, and such rights may be assigned by an assignee thereof to a similar assignee, provided that such assignment shall not release or alter any liability, undertaking or obligation hereunder. This Agreement and all rights and obligations hereunder shall be binding upon the successors, assignees and legal representatives of both parties. Any sale of List Manager's business, or any change of ownership or control of List Manager's business, shall be considered transfer and assignment under this Paragraph 25, such transfer and assignment of this Agreement being subject to List Owner's consent.

26. This Agreement sets forth the entire Agreement between the parties as to the subject matter hereof and neither party shall be bound by any amendment or modification hereto except as may be set forth subsequent to the date hereof in writing signed by a properly authorized representative of both parties.

27. This Agreement shall be governed by and be construed in accordance with the internal law of the State of New York. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, or otherwise relating to, this Agreement may be brought in the courts of the State of New York, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each of the parties, for itself, hereby submits to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.


Recycled Paper

- 5 -



28. The terms and conditions hereof are confidential to the parties. The parties may disclose this Agreement to their employees, officers, directors, attorneys and accountants, all of whom shall be bound by the aforesaid confidentiality requirement. The parties may also disclose this Agreement if so required by a governmental agency or by a court of competent jurisdiction. Neither party shall reveal this Agreement to any third party or any of such third party's officers, directors, employees, agents, or representatives.

Acknowledged & Agreed:

BMG DIRECT

By: _____

Date: 9/30/99

AMERICAN LIST COUNSEL, INC.

By: _____

Date: 9/27/99



-6-



# EXHIBIT E

## LIST MANAGEMENT AGREEMENT

This agreement ("Agreement") is made as of March 1, 2004 (the "Effective Date") by and between BeMusic, Inc., having an office at 28 East 28th Street, New York, NY 10016 (List Owner) and The SpeciaLIST's Ltd. d/b/a ClientLogic, having an office at 1200 Harbor Boulevard, 9th Floor, Weehawken, New Jersey 07087 (List Manager) with regard to the management of list programs as set forth in this Agreement.

1.     List Owner appoints List Manager to manage the BeMusic lists set forth in Section I of Exhibit "A" for a list management fee of 7% of the gross rental dollars billed (excluding tape fees, shipping charges and selection charges) ("Gross Rental Dollars") for which payment is received.

2.     If net rental dollars billed (i.e. gross rentals less list management fees, brokerage fees, advertising agency fees and adjustments including selection charges)("Net Dollars Billed") exceed the budget goal set forth in Section II of Exhibit A ("Budget Goal") by more than $500,000, the list management fee for those Net Dollars Billed will increase as follows:

- To the extent that the Net Dollars Billed exceed the Budget Goal by between $500,000 and $999,999.99, the list management fee will be 7.5% of the Net Dollars Billed within this range.
- To the extent that the Net Dollars Billed exceed the Budget Goal by between $1,000,000 and $1,499,999.99, the list management fee will be 8.0% of Net Dollars Billed within the range.
- To the extent that the Net Dollars Billed exceed the Budget Goal by $1,500,000 or more, the list management fee will be 8.5% of Net Dollars Billed above this amount.

For further clarity and by way of example only, list management fees will be calculated as follows:

Budget Goal =         $3,971,220.00
Actual =              $8,000,000.00
Management Fee =      $605,431.70

| Range | Billings | Rate | List Management Fee |
|---|---|---|---|
| $3,971,220 - $4,471,219.99 (gross) | $4,471,219.99 | 7.00% | $312,985.40 |
| $4,471,220 - $4,971,219.99 (net) | $500,000.00 | 7.50% | $37,500.00 |
| $4,971,220 - $5,471,219.99 (net) | $500,000.00 | 8.00% | $40,000.00 |
| $5,471,220+ (net) | $2,528,780.01 | 8.50% | $214,946.30 |
| | $8,000,000.00 | | $605,431.70 |

3.     In the event that the Budget Goal is not met, the list management fee will decrease as set forth in this Section 3.

- If there is a shortfall in meeting the Budget Goal by less than $1,000,000.00, the

list management fee on all Gross Rental Dollars will be 6.5%.
- If there is a shortfall in meeting the Budget Goal by more than 1,000,000.00, the list management fee on all Gross Rental Dollars will be 6%.

In the event of a shortfall at the end of a calendar year, List Manager will refund or credit the appropriate list management fee, if any, based on this Section 3 within thirty (30) days. For further clarity and by way of example only, list management fees shall be calculated as follows:

Example 1:
Budget Goal = $3,971,220
Actual = $3,471,219
List Management Fee: $3,471,219 x 6.5% (.065) = $225,629.24

Example 2:
Budget Goal = $3,971,220
Actual = $2,971,219
List Management Fee: $2,971,219 x 6% (.06) = $178,273.14

It is acknowledged and agreed that if the Budget Goal is not met due to material changes by the List Owner within the list rental program which have an adverse impact on the ability of the List Manager to obtain the Budget Goal, and to the extent there is a shortfall in the Budget Goal that is not offset by other business opportunities provided by List Owner, then, at the sole discretion of the List Owner, List Manager's budget goal may be adjusted by amounts that correlate directly with any such loss in ability. Further, if the List Owner provides additional business opportunities through material changes to the list rental program which result in increased opportunity to obtain and/or exceed the Budget Goal then, at the sole discretion of the List Owner, List Manager's Budget Goal may be adjusted up to reflect such additional business opportunities by amounts that correlate directly with any such gain in opportunity. In the event of an adjustment in the budget goal, the base for incentive payments as stated in Section 2 and for rebates as stated in Section 3 may be adjusted accordingly.

4. The list properties that are subject to this Agreement are set forth in Section I of Exhibit A ("List Properties"). It is acknowledged that any list business arising in connection with any company acquired by List Owner, or any new business startups by List Owner, except those set forth in Section I of Exhibit "A", are not included in this Agreement and will be subject to separate negotiations if List Owner and List Manager wish to incorporate such list and/or alternative media business herein. Further, it is acknowledged that List Owner has the right to move portions of the list business at anytime subject to Section 3 above.

5. List Manager will assume responsibility for the cost of the PC Direct Select (PCDS) count system supplied to their location by Experian Marketing Services on a monthly basis. List Manager will assume responsibility for the cost of training on the PC Direct Select (PCDS) count system.

6. At the discretion of List Owner, for exchanges and direct rentals of the List Properties arranged by List Owner or on its behalf, List Manager will receive a processing fee of $4.00/M

2

not to exceed $400 per order.

7. A standard list brokerage fee of 20% or advertising agency fee of 15%, as appropriate, will be deducted from Gross Rental Dollars for recognized brokers and agencies for which payment is received. List Manager will retain a 20% brokerage fee for list rentals directly to its customers, in addition to the list management fee.

8. List Owner will have absolute control over all pricing and policies governing the use of all BeMusic lists.

9. List Owner will control all list rentals and exchanges, and retains the absolute right to disapprove any proposed rental or exchange for any reason List Owner deems appropriate in its sole discretion (e.g., competitive mailers, etc.). List Manager agrees to furnish sample mail pieces for all proposed rentals and exchanges for List Owner's approval in advance of any such rental or exchange. All rentals and exchanges hereunder shall be conducted in accordance with the terms and conditions hereunder, specifically Exhibit "C".

10. Notwithstanding List Manager's exclusive right to manage the List Properties during the term of this Agreement, List Owner can accept orders directly from brokers and mailers or structure direct corporate deals with other marketers, specifically but not limited to AOL Time Warner, which may include, but not be limited to, list rental/exchange. In such event, List Owner will pay List Manager any applicable fees for services provided hereunder. Such fees shall be in accordance with Section 6 above.

11. List Manager will bill and collect all monies due and will forward monies collected to the List Owner under this Agreement semi-monthly immediately following receipt of such payments from list users or their agents. It is understood that List Manager shall render payments to List Owner on the 15th and on or about $30/31^{st}$ of each month. List Manager shall make best efforts to collect all monies due in a timely manner and will submit a written report of outstanding accounts over one hundred and twenty (120) days with comments and status as set forth in Exhibit "B". List Owner reserves the right to not pay the list management fee for any payments which are over 120 days past due (past mail date). List Owner shall have the right to discontinue list services to any outstanding account(s) that is over sixty (60) days. List Manager is responsible for the billing and collection of all monies in connection with list services hereunder. List Owner also reserves the right to require payment directly from brokers at any time for any reason in its sole discretion.

12. List Manager will provide List Owner with a marketing plan by March 1, 2004 for the contract year 2004 for List Owner's review and approval as set forth in Section 16. List Manager agrees to spend no less than 15% of the target annual list management fees set forth in this Agreement (not including processing fees as described in Section 6 above) on marketing and promotion to include the proportionate (Currently 50% to be adjusted each year between List Manager and Insert Manager) funding of the BeMusic promotional event held at the Fall DMA Conference under the term of this Agreement. The aforementioned marketing and promotion elements which make up the plan will be subject to review and approval by List Owner. List Owner will endeavor to work with List Manager to complete review and approval within sixty

3

(60) days of receipt of such plan. All receipts and backup documentation of marketing dollars spent must be provided to List Owner within three (3) days of request. A formal and comprehensive report of spending will be submitted on July 31, 2004 and December 31, 2004 covering the prior six (6) months expenses. In the event 15% of management fee is not spent on the marketing of BeMusic's list programs, the difference between the 15% management fee commitment and the actual dollars spent on marketing will be rebated to List Owner within sixty (60) days of year's end. In the event of early termination of this Agreement, List Manager shall forward any such marketing and promotion rebate to List Owner immediately.

13.  List Owner has set forth in the italicized Section III of Exhibit "A" marketing goals for the balance of the calendar year for 2004. Satisfactory performance of the plan shall be considered a material term of this Agreement. A work plan, deliverables and milestones will be established mutually by List Owner and List Manager and subject to approval by List Owner.

14.  List Manager will hire, train and maintain the mutually agreed upon account management team consisting of a minimum of 5.25 FTEs (Full Time Equivalent) employees for the List Properties. However, List Owner shall have final decision of account management team leader and FTEs. List Manager shall use commercially reasonable efforts to retain the employment of the FTE's, and the agreed upon account management team leader and FTEs shall remain on the BeMusic account during the term of this Agreement. The FTEs will consist of 2 Senior Account Directors, 1 Sales Manager, 1 Production Director, 1 Production Manager and 2 Production Assistants responsible for the sales, marketing, analysis and processing/production of the List Properties. In addition, the FTEs shall attend certain trade shows, conferences, etc., in which they shall represent the List Properties exclusively. During the term of this Agreement, 2.5 of the FTEs will be exclusively responsible for the day-to-day production activities on the List Properties. The Production Managers will be responsible for contact with brokers, providing counts, arranging shipping, and any other functions necessary to ensure the List Properties are being serviced in accordance with the terms of this Agreement. FTEs are to be agreed upon by List Owner's written approval, and List Manager is to supply listing of FTEs by name, title and responsibilities to List Owner by March 1, 2004. List Manager will not institute changes in composition of the team or support group, including the team leader, without List Owner's prior written approval. List Owner reserves the right to request FTE personnel changes based on performance at List Owner's discretion subject to List Manager's policies and procedures. There will be no reduction in total FTEs comprising the dedicated account management team without List Owner's prior written approval. In addition, List Manager agrees to have appropriate FTEs available for travel to (including but not limited to) the BeMusic facility in Indianapolis, IN and any operational and/or business travel destinations necessary to properly service the List Properties.

15.  List Manager will render financial and performance reports in accordance with Exhibit "B". In addition, List Manager will render performance reports against targets in formats and on schedules as required by List Owner. Preliminary annual financial business plans are due to List Owner by March 15, 2004 in accordance with Exhibit "C". List Manager must provide List Owner with a certified and audited Statement of Good Financial Standing of List Manager's business at end of each Calendar Year.

4

16. Operating standards for on-going communications, clearances, advertising, sales meeting schedules, press releases and planning are set forth in Exhibit "C".

17. List Manager will conduct quarterly performance presentations containing detailed reviews of all activities under this Agreement based on format and content requirements to be established by List Owner. Preparation and presentation of the quarterly reviews will be undertaken directly by the Senior Account Director designated as the team leader and other members of the team when necessary. Quarterly performance presentations will be submitted in final form to List Owner no less than three (3) business days prior to presentation date. List Owner to provide any necessary change requests to List Manager no less than 24 hours prior to presentation date.

18. It is understood and agreed that during the term of this Agreement List Manager will restrict its business relationship with competitors of List Owner in the manner set forth below. Specifically, List Manager will not provide management services of any nature whatsoever to any marketer of music, including, by way of example and not by way of limitation, Columbia House, TimeLife Music, and Musical Heritage. This includes brokerage, direct sales, insert management, or Internet services. Any current accounts as described above other than any Bertelsmann owned property, will be resigned by List Manager immediately upon execution hereof with termination effective no later than fifteen (15) days hereafter or as may be otherwise agreed upon by the parties. However, it is understood that List Manager will be permitted to rent other properties that it manages, including lists to Columbia House or other marketers of music.

19. This Agreement and any confidential information (whether oral or written) shall be governed by terms of the Confidentiality Agreement executed between the Parties on November 3, 2003, the provisions of which will survive the term of this Agreement. The terms and conditions of this Agreement shall be considered confidential information thereunder.

20. This Agreement shall become effective on the date last signed below and shall continue in force through December 31, 2004. Thereafter, this Agreement shall automatically renew for one (1) year terms (the "Term") unless either party gives the other party written notice of non-renewal ninety (90) days before the expiration of the then current Term. Financial and Budget Goals shall be negotiated for each renewal Term. List Manager does not have or acquire by execution of this Agreement, by performance hereunder, or otherwise, any vested right with respect to the renewal of this Agreement. List Owner, at any time during the term, shall have the absolute right at its sole discretion to terminate this Agreement for any reason whatsoever upon written notice, said termination to be effective thirty (30) days from receipt of such notice. Either party may terminate this Agreement for default with ten (10) days written notice (including a detailed description of the default) and opportunity to cure. The following shall be considered a default by List Manager under this Agreement: consistent monthly shortfalls in sales goals or significant shortfalls in the aggregate, collection/receivable problems, delayed remittance by List Manager, advertising and promotion inconsistent with that approved by List Owner, failure to render financial and performance reports in an accurate or timely manner, failure to adhere to operating standards, unapproved change in dedicated-staff members or reduction in the number of FTEs dedicated to List Owner's account. List Owner may immediately terminate this Agreement if: (i) List Manager has an entry of any material judgment

against it, which judgment is not satisfied or appealed within fifteen (15) days of such judgment entering; (ii) List Owner is served with any process seeking to attach or garnish any of List Managers funds in List Owner's possession; (iii) List Manager terminates its existence, dissolves or winds up, liquidates and/or ceases business as usual; (iv) List Manager sells all or substantially all of its assets; (v) List Manager's business fails or a material adverse change in List Manager's financial conditions occurs; (vi) an application of or appointment of a receiver, trustee, or other person (pursuant to a valid court action, order or otherwise) over all or any part of List Manager's property is filed; (vii) there is an assignment of all or part of List Manager's assets for the benefit of creditors; (viii) there is an occurrence of any voluntary or involuntary liquidation; or (ix) there is an entry of an order for relief or similar order with respect to List Manager in any proceeding to any statute dealing with bankruptcy. List Manager shall have the right to terminate the Agreement at any time during the Term of this Agreement upon three (3) months advance written notice. If the parties continue a business relationship after termination or non-renewal of this Agreement, such relationship shall not be construed as a renewal or a waiver of termination, but such relationship shall be on a month to month basis and all such transactions shall be governed by the provisions of this Agreement.

21. Upon expiration of this Agreement, or termination as described above, List Manager warrants and represents that it will make best efforts to ensure a smooth transition and that List Owner's business and operations with respect to activities hereunder is uninterrupted. This shall include, but not be limited to, providing List Owner with all historical account information, aging reports, data, records, and any other reports or reasonable request by List Owner.

22. List Owner will have the right to audit List Manager's books and records pertaining to all transactions and activities in connection with this Agreement once every twelve (12) months during the term of the Agreement and once within two (2) years following termination. Such audits will be conducted during normal business hours where such books and records are normally maintained, and will be subject to fifteen (15) days advance written notice request by List Owner and subject to List Manager's agreement as to the date and time of such audit.

23. To the extent state and local taxes must be collected on transactions hereunder, List Owner will instruct List Manager, and List Manager will bill clients as instructed and remit payments to List Owner so that appropriate payments can be remitted to state and local tax authorities.

24. Each party will promptly advise the other by certified mail of any actions at law, regulatory proceedings, or any other actions, proceedings, or inquiries brought by any state or federal authority. Notices shall be sent to the following addresses (or such other address as either party may specify in writing):

If to ClientLogic Specialists
Marketing Services, Inc.:
1200 Harbor Boulevard
9th Floor
Weehawken, NJ 07087
Attn.: Lon Mandel

If to BeMusic:
28 East 28th Street
New York, New York 10016
Attn.: Associate Director,

6

ClientLogic  
3102 West End Avenue  
Suite 900  
Nashville, TN 37203  
Attn: General Counsel  

List Rental Services  

*With a copy to:*  
Sr. Vice President,  
Legal & Business Affairs  
*And a copy to:*  
Irene Ferrall  
Senior Director, Alternate Channel  
Marketing Team  

25. Each party hereby represents, warrants and agrees that (i) it has the right, power, and authority to enter into this Agreement and is fully capable of performing its obligations under, and in accordance with, this Agreement, and (ii) the entry into this Agreement by such party, and the performance by such party of its obligations and duties hereunder, do not and will not violate any agreement of such party or by which such party is bound.

26. EXCEPT FOR SECTION 27 BELOW, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, OR SPECIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS) INCURRED BY EITHER PARTY AS A RESULT OF ANY BREACH BY EITHER PARTY ARISING FROM OR RELATED TO THIS AGREEMENT.

27. List Manager will indemnify, defend and hold List Owner, its affiliates and subsidiaries, and their respective directors, shareholders, officers, agents and employees harmless with respect to any and all settlements, claims, or actions brought by any third party against List Owner based on List Manager's negligence, acts, omissions or performance or failure thereof under this Agreement, actual or alleged. List Owner will indemnify, defend and hold List Manager harmless with respect to any and all settlements, claims, or actions brought by any third party against List Manager based on List Owner's performance or failure thereof under this Agreement, actual or alleged.

28. Each party agrees that during the term of this Agreement and for the twelve (12) month period commencing on the date this Agreement expires or is terminated, that it shall not, either directly or indirectly, on its own behalf or in the service or on behalf of others, solicit, recruit, or attempt to persuade any employee of the other party to terminate such person's employment.

29. This Agreement is personal to the parties and may not be transferred or assigned without the consent of the other party, except that List Owner may assign this agreement, in whole or in part, to its parent, to any subsidiary corporations, to any affiliated company, or to any company into which it is merged or by which it is acquired, and such rights may be assigned by an assignee thereof to a similar assignee, provided that such assignment shall not release or alter any liability, undertaking or obligation hereunder. This Agreement and all rights and obligations hereunder shall be binding upon the successors, assignees and legal representatives of both parties. Any sale of List Manager's business, or any change of ownership or control of List Manager's business, shall be considered transfer and assignment under this Section 29, such transfer and assignment of this Agreement being subject to List Owner's consent, such consent

7

not to be unreasonably withheld.

30. The parties intend that an independent contractor relationship shall be created by this Agreement, and that nothing contained herein shall create any affiliateship, joint venture, agency, franchise, sales representative or employment between the parties. Neither party shall have the right to bind the other to any agreement with a third party nor to represent itself as an agent, partner or joint venture of the other, nor to incur any obligation or liability on behalf of the other. Neither party shall make any statement, in its publication materials nor otherwise, that reasonably would contradict anything in this Section 30. Further, List Manager has no authority to speak on behalf of List Owner in any matter, nor accept orders or in any way participate in the transaction of business between List Owner and its customers. The parties agree that List Manager does not act under the authority or control of List Owner for any purpose. This Agreement does not permit List Manager to engage in any promotional activity concerning List Owner except as explicitly set forth in this Agreement or as may be agreed to by both parties in a written contract or amendment to this Agreement signed by both parties.

31. Neither party will make any detailed publications or statements to the public, including press releases concerning this Agreement, without the prior written consent of the other.

32. This Agreement sets forth the entire Agreement between the parties as to the subject matter hereof and neither party shall be bound by any amendment or modification hereto except as may be set forth subsequent to the date hereof in writing signed by a properly authorized representative of both parties.

33. This Agreement shall be governed by and be construed in accordance with the internal law of the State of New York. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, or otherwise relating to, this Agreement may be brought in the courts of the State of New York, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each of the parties, for itself, hereby submits to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

34. Neither party shall be liable or deemed in default of this Agreement, unless specifically addressed otherwise herein to the extent that performance of its obligations or attempts to cure any breach are delayed, restricted or prevented by reason of any act of God, fire, natural disaster, act of government, strikes or labor disputes, any actual (or threatened) act of terrorism, inability to provide raw materials, power or supplies, or any other similar act or condition beyond the reasonable control of the parties; provided that the party so affected provides prompt notice and uses all reasonable commercial efforts to avoid or remove the causes of nonperformance and continues performance hereunder immediately after those causes are removed. Upon such circumstances arising, the parties shall meet forthwith to discuss what, if any, modification may be required to the terms of this Agreement, in order to reach a resolution.

Accepted & Agreed:

| BeMusic, Inc. | The SpeciaLIST's Ltd. d/b/a ClientLogic |
|---|---|
| BY: *Irene M. Ferrall* | BY: *Lon Mandel* |
| NAME: Irene M. Ferrall | NAME: Lon Mandel |
| TITLE: Senior Director | TITLE: Marketing Services Officer |
| DATE: 2·5·04 | DATE: 2-4-04 |

9